### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

| | | |
|---|---|---|
| VICTORIA SAWYER AND JOSEPH ROBERTS, *individually and on behalf of all others similarly situated*, | ) ) ) | No. 1:21-cv-00176-RA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| SIRIUS XM RADIO INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

-------------------------------------------------- x

### DEFENDANT SIRIUS XM'S MEMORANDUM OF LAW IN SUPPORT OF ITS
### MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Lee A. Armstrong
Allison L. Waks
JONES DAY
250 Vesey Street
New York, New York
Tel: (212) 326-3939
Fax: (212) 755-7306
Email: laarmstrong@jonesday.com
Email: awaks@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

*Counsel for Sirius XM Radio Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.   The ATDS Provision and Its History .................................................... 2

    B.   Sawyer and Roberts Sue Sirius XM for Unwanted Phone Calls .......................... 5

LEGAL STANDARD ........................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.    Plaintiffs Do Not Plausibly Allege the Presence of a Random or Sequential Number Generator ....................................................................................................... 7

    A.   *Facebook* Requires the Presence of a Random or Sequential Number Generator ........................................................................................ 7

    B.   Plaintiffs Have Not Plausibly Alleged the Presence of Random or Sequential Number Generator ........................................................... 9

    C.   Plaintiffs' Likely Counterarguments Fail .......................................... 13

        1.   "Capacity" cannot save Plaintiffs' claims ............................... 14

        2.   Footnote 7 cannot save Plaintiffs' claims ............................... 15

CONCLUSION .................................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aaronson v. CHW Grp., Inc.*,
No. 1:18-cv-1533, 2019 WL 8953349 (E.D. Va. Apr. 15, 2019) ............................................12

*ACA Int'l v. FCC*,
885 F.3d 687 (D.C. Cir. 2018) ........................................................................................4, 16

*Andrews v. Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019) ................................................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2019) ....................................................................................................7, 10

*Bader v. Navient Solutions, LLC*,
No. 18-cv-1367, 2019 WL 2491537 (N.D. Ill. June 14, 2019) ...............................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................7

*Despot v. Allied Interstate, Inc.*,
No. 15-15, 2016 WL 4593756 (W.D. Pa. Sept. 2, 2016) ........................................................11

*Dominguez v. Yahoo, Inc.*,
894 F.3d 116 (3d Cir. 2018) ....................................................................................................1

*Duran v. La Boom Disco, Inc.*,
955 F.3d 279 (2d Cir. 2020) ..............................................................................................1, 5

*Facebook, Inc. v. Duguid*,
141 S. Ct. 1163 (2021) ................................................................................................ passim

*Gadelhak v. AT&T Servs., Inc.*,
950 F.3d 458 (7th Cir. 2020) ............................................................................................1, 5

*Glasser v. Hilton Grand Vacations Co.*,
948 F.3d 1301 (11th Cir. 2020) ..............................................................................................1

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010) ..............................................................................................7, 13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Herrera v. Navient Corps.*,
No. 19-CV-06583 (AMD) (VMS), 2020 WL 3960507 (E.D.N.Y. July 13,
2020) ...................................................................................................................10

*Jackson v. Caribbean Cruise Line, Inc.*,
88 F. Supp. 3d 129 (E.D.N.Y. 2015) ...................................................................11

*King v. Time Warner Cable Inc.*,
894 F.3d 473 (2d Cir. 2018).........................................................................14, 15

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ................................................................................5

*Krady v. Eleven Salon Spa*,
No. 16 CV 5999 (MKB)(RML), 2017 WL 6541443 (E.D.N.Y. July 28, 2017) ...................10

*Lundstedt v. Deutsche Bank Nat'l Trust Co.*,
No. 3:13-cv-01423 (JAM), 2016 WL 3101999 (D. Conn. June 2, 2016)...............12

*Marks v. Crunch San Diego, LLC*,
904 F.3d 1041 (9th Cir. 2018) ..............................................................................4

*Metten v. Town Sports Int'l, LLC*,
18-CV-4226 (ALC), 2019 WL 1299939 (S.D.N.Y. Mar. 21, 2019) ......................11

*Mosley v. Gen. Revenue Corp.*,
No. 1:20-cv-01012-JES-JEH, 2020 WL 4060767 (C.D. Ill. July 20, 2020)............10

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)...................................................................................7

*New York v. Town of Clarkstown*,
95 F. Supp. 3d 660 (S.D.N.Y. 2015)......................................................................9

*Norman v. AllianceOne Receivables Mgmt., Inc.*,
637 F. App'x 214 (7th Cir. 2015) .........................................................................12

*Perez v. Quicken Loans, Inc.*,
No. 19-cv-2072, 2020 WL 1491145 (N.D. Ill. Mar. 27, 2020) ............................13

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*PHL Variable Ins. Co. v. Town of Oyster Bay,*
    929 F.3d 79 (2d Cir. 2019)......................................................................................7

*Rotberg v. Jos. A. Bank Clothiers, Inc.,*
    345 F. Supp. 3d 466 (S.D.N.Y. 2018).....................................................................11

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) .................................................................................14

*Scalercio-Isenberg v. Citizens Fin. Grp., Inc,*
    No. 18-cv-9226 (JGK), 2019 WL 7187247 (S.D.N.Y. Dec. 26, 2019)...................12

*Schleifer v. Lexus of Manhattan,*
    No. 17-cv-8789 (AJN), 2019 WL 4640055 (S.D.N.Y. Sept. 24, 2019) ..................11

*Shcherb v. Angi Homeservices Inc.,*
    No. 19-CV-367 (JPO), 2019 WL 5530803 (S.D.N.Y. Oct. 25, 2019)......................10

*Simon v. Ultimate Fitness Grp., LLC,*
    No. 19 Civ. 890 (CM), 2019 WL 4382204 (S.D.N.Y. Aug. 19, 2019) ...................11

*Trumper v. GE Capital Retail Bank,*
    79 F. Supp. 3d 511 (D.N.J. 2014) ..........................................................................11

STATUTES

47 U.S.C. § 227(a)(1)..............................................................................................1, 3, 9, 14

47 U.S.C. § 227(b)(1) ...................................................................................................1, 2, 3

47 U.S.C. § 227(c) ..............................................................................................................3

OTHER AUTHORITIES

47 C.F.R. § 64.1200(f)(8)(i)...............................................................................................1

Federal Rules of Civil Procedure Rule 12(b)(6) ................................................................6

Federal Rules of Civil Procedure Rule 12(c) ...............................................................1, 6, 7

### TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Rules & Regs. Implementing the TCPA*,
  7 FCC Rcd. 8752 (1992) ..................................................................................3

*In re Rules & Regs. Implementing the TCPA*,
  10 FCC Rcd. 12391 (1995)..............................................................................3

*In re Rules & Regs. Implementing the TCPA*,
  17 FCC Rcd. 17459 (2002)..............................................................................4

*In re Rules & Regs. Implementing the TCPA*,
  18 FCC Rcd. 14014 (2003)..............................................................3, 4, 12, 13

*In re Rules & Regs. Implementing the TCPA*,
  23 FCC Rcd. 559, 566 (2008)..........................................................................4

*In re Rules & Regs. Implementing the TCPA*,
  27 FCC Rcd. 15391 (2012)..............................................................................4

*In re Rules & Regs. Implementing the TCPA*,
  30 FCC Rcd. 7961 (2015)...........................................................................4, 14

*Telemarketing/Privacy Issues: Hearing Before the House Subcommittee on
  Telecommunications and Finance*, 102d Cong. 111 (1991)..................................2

Defendant Sirius XM Radio Inc. ("Sirius XM") moves for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure with respect to Plaintiff Victoria Sawyer's and Plaintiff Joseph Roberts's First Claim for Relief, which alleges that Sirius XM called Plaintiffs' wireless numbers with an automatic telephone dialing system in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(f)(8)(i).  That claim does not survive dismissal following *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021).

## INTRODUCTION

For years, a debate raged about what kinds of equipment qualified as an "automatic telephone dialing system" (or "ATDS") subject to the Telephone Consumer Protection Act's ("TCPA") restrictions on calls to wireless numbers.  47 U.S.C. § 227(a)(1)(A).  To Sirius XM and the many other defendants caught in the crosshairs of TCPA litigation, the answer was clear.  To be an ATDS, the equipment must contain a random or sequential number generator, since that is precisely what the TCPA provides:  an ATDS must "ha[ve] the capacity … to store or produce telephone numbers to be called, *using a random or sequential number generator*," 47 U.S.C. § 227(a)(1)(A) (emphasis added).  A host of courts agreed.  *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) (Barrett, J.); *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301 (11th Cir. 2020) (Sutton, J.); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018) (Roth, J.). Others, however, took the plaintiffs' bar's far broader view.  They stated that the statute's key modifier affected only the verb "produce," not "store."  As a result, they concluded that the statute covers anything that "store[s]" and dials numbers "automatically"—even from a "human-generated list."  *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 283 (2d Cir. 2020), *vacated and remanded*, 2021 WL 1520774, at *1 (U.S. Apr. 19, 2021).

Plaintiffs Victoria Sawyer and Joseph Roberts—who live outside the Second Circuit— sought to profit from this confusion by suing Sirius XM for a few calls that Sirius XM's vendors

placed to them.  To magnify the impact of the statute's $500-per-call damages, they added class allegations.  Unfortunately for them, the ATDS provision's reign of error has now come to an end. In *Facebook, Inc. v. Duguid*, the Supreme Court reversed those circuits that had taken a broad view of the ATDS definition and instead held that, to qualify, equipment "must use a random or sequential number generator."  141 S. Ct. 1163, 1170 (2021).  Plaintiffs have not plausibly alleged that Sirius XM's vendors' equipment has that unusual ability, so their first Claim for Relief fails.

## BACKGROUND

### A.      The ATDS Provision and Its History

Congress passed the TCPA in 1991 to address "'the proliferation of intrusive, nuisance calls' to consumers and businesses from telemarketers."  *Facebook*, 141 S. Ct. at 1167 (quoting 105 Stat. 2394, § 2, ¶¶ 1, 6).  But because the types of those calls varied, Congress enacted different kinds of protection against different kinds of intrusions.  For example, Congress made it illegal to place "[i]nfamous[]" "robocall[s]"—"calls using artificial or prerecorded voices"—to residential and wireless numbers alike.  *Id.*; *see* 47 U.S.C. § 227(b)(1)(B) (residential); 47 U.S.C. § 227(b)(1)(A) (wireless and other specialized lines).

Congress passed more targeted restrictions, however, on what it called "automatic telephone dialing systems."  These ATDSs (or "autodialers") "revolutionized telemarketing by allowing companies to dial random or sequential blocks of telephone numbers automatically." *Facebook*, 141 S. Ct. at 1167.  That approach was "uniquely harmful."  *Id.*  "[D]ue to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines."  *Id.*; *see also Telemarketing/Privacy Issues: Hearing Before the House Subcommittee on Telecommunications and Finance*, 102d Cong. 111 (1991) (statement of Michael J. Frawley) (describing how sequential dialing knocked out nascent wireless networks).  And by dialing randomly generated numbers, these devices "reach[ed]

cell phones, pagers, and unlisted numbers, inconveniencing consumers and imposing unwanted fees." *Facebook*, 141 S. Ct. at 1167.

"Against this technological backdrop," *id.*, Congress made it unlawful to use an ATDS, defined as equipment which "has the capacity … to store or produce telephone numbers to be called, using a random or sequential number generator[,] … and to dial such numbers." 47 U.S.C. § 227(a)(1). But Congress limited those protections to the "business, emergency, and cellular lines" threatened by autodialing technology. *Facebook*, 141 S. Ct. at 1172; *see* 47 U.S.C. § 227(b)(1)(A) (protecting, among others, emergency and wireless lines); 47 U.S.C. § 227(b)(1)(D) (protecting against the use of an ATDS to tie up multiple "lines of a multi-line business" "simultaneously"). Callers remained free to call residential lines using ATDSs unless the recipient had previously opted out of receiving *any* call, no matter the technology used to deliver it. *See* 47 U.S.C. § 227(c) (authorizing the FCC to create the nationwide Do Not Call Registry). After all, the chief evils caused by autodialing technology—pricey per-minute charges imposed on unwitting recipients and calls that shut down entire blocks of numbers—did not result from ATDS calls that happened to reach residential wireline customers.

For years, everyone read the ATDS provision to mean that it actually covers only equipment that "randomly or sequentially generate[s] numbers"—which is what the statute says. *In re Rules & Regs. Implementing the TCPA*, 10 FCC Rcd. 12391, 12400 (1995); *see also In re Rules & Regs. Implementing the TCPA*, 7 FCC Rcd. 8752, 8776 (1992) (the provision "clearly do[es] not apply to functions like 'speed dialing' … because the numbers are not generated in a random or sequential fashion"). As a result, there was very little litigation, and random or sequential dialing machines largely faded from the scene. *See In re Rules & Regs. Implementing the TCPA*, 18 FCC Rcd. 14014, 14092–93 (2003) ("2003 TCPA Order") ("*In the past*,

telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily." (emphasis added)).

But then the FCC began suggesting that the statute covered far more devices. It was concerned that telemarketers were using "new technologies" such as "predictive dialers"—devices that call multiple lines at once, using an algorithm to predict the number of recipients who will answer and then be transferred to waiting agents—in ways that aggravated consumers. *In re Rules & Regs. Implementing the TCPA*, 17 FCC Rcd. 17459, 17474 (2002). And so the FCC began to suggest that, in fact, the statute covers predictive dialers and anything else that "dial[s] numbers without human intervention," even if the equipment does not "randomly or sequentially generate numbers." *See* 2003 TCPA Order, 18 FCC Rcd. at 14092–93; *see also, e.g.*, *In re Rules & Regs. Implementing the TCPA*, 23 FCC Rcd. 559, 566 (2008) (similar); *In re Rules & Regs. Implementing the TCPA*, 27 FCC Rcd. 15391, 15392 n.5 (2012). In 2015, moreover, the FCC set forth contradictory tests for what qualifies as an ATDS, sometimes saying that an ATDS need only "dial[] from a set list of numbers" and sometimes saying that it must instead "creat[e] and dial[] a random or arbitrary list" itself. *ACA Int'l v. FCC*, 885 F.3d 687, 702 (D.C. Cir. 2018) (discussing *In re Rules & Regs. Implementing the TCPA*, 30 FCC Rcd. 7961 (2015) ("2015 TCPA Order")). These contradictory tests led the D.C. Circuit to set aside the FCC's ATDS definition as arbitrary and capricious. *See id.* at 703.

Judicial confusion followed. Some circuits held that the D.C. Circuit's decision freed them to read the statute on their own, but they came to conflicting decisions as to whether it covers equipment that simply dials from a list. *Compare, e.g.*, *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1050 (9th Cir. 2018) (anything that automatically dials "from a stored list"), *with Gadelhak*, 950 F.3d at 468 (the equipment must have "the capacity to generate random or

sequential numbers"). The Second Circuit adopted the broader, more plaintiff-friendly interpretation, in part because it believed that the FCC's pre-2015 statements remained good law. *See Duran*, 955 F.3d at 287. On July 9, 2020, the Supreme Court granted certiorari in *Facebook* to decide which position was right. *See* 141 S. Ct. 193 (2020) (mem.).

### B. Sawyer and Roberts Sue Sirius XM for Unwanted Phone Calls.

This case concerns phone calls that were placed after the Supreme Court granted certiorari in *Facebook,* but before it rendered its decision. Sirius XM operates a nationwide satellite radio service. As relevant here, "Sirius XM has arrangements with many major automakers … to install satellite radio receivers in new vehicles." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 562 (9th Cir. 2014). Pursuant to agreements between Sirius XM, OEMs, and car dealerships, many of those who buy new or pre-owned automobiles equipped with Sirius XM-compatible receivers receive a trial subscription to Sirius XM's services included with their vehicle purchase. Near the end of that subscription, Sirius XM contacts trial subscribers to offer them the option of converting to a self-paying subscription to continue receiving Sirius XM's services. *See Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1256 (9th Cir. 2019) (describing these practices).

Plaintiff Sawyer alleges that on November 20 and November 24, she received (but did not answer) calls from a certain 866 number. Compl. ¶¶ 21–22. She alleges that she later called the number to "investigate who called her." Compl. ¶ 23. She asserts that she "heard an automated message stating that it was Sirius [XM]," and she allegedly attempted to opt out of future calls by pressing 3 per the message's instructions. Compl. ¶ 24. She was then transferred to a live operator and reiterated her request not to be contacted. Compl. ¶ 25. She alleges, however, that she nonetheless received other calls from the 866 number on November 30, 2020, December 4, 2020, and December 11, 2020. Compl. ¶¶ 26–27. She answered the last of these calls and claims that

she "heard a click" and that she "needed to say 'Hello' multiple times before a person answered her."  Compl. ¶ 27.

Plaintiff Roberts had a similarly boilerplate experience.  Roberts alleges that on November 19, 2020, he received a call from someone trying to sell him a Sirius XM subscription.  Compl. ¶ 35, 37.  Like Sawyer, Roberts claims that "[w]hen he answered the call, he heard a click and had to say 'hello' multiple times before [the] operator joined the call."  Compl. ¶ 36.  Roberts does not claim he received any other calls.

On January 8, 2021, Sawyer and Roberts brought this putative class action against Sirius XM.  As relevant here, Plaintiffs claimed that Sirius XM used an ATDS to call them.  Compl. ¶¶ 27, 36.  But they were cagey on what exactly they meant by that term.  On the one hand, copying the statutory language, they asserted that Sirius XM's vendors' equipment "ha[d] the capacity to store or produce telephone numbers to be called using a random or sequential number generator." Compl. ¶ 51.  On the other hand, mirroring the dial-from-a-list theory of liability adopted in *La Boom Disco*, they alleged that Sirius XM's vendors' equipment "receive[d] and store[d] lists of phone numbers" and then "dial[ed] such numbers, *en masse*, simultaneously and without human intervention."  Compl. ¶ 51.  They also sought to represent a class of similarly situated individuals, $500 per call in statutory damages, and up to three times that amount in damages for willful violations.  Compl. ¶¶ 42–47, 54–55.

After the Supreme Court's decision in *Facebook*, Sirius XM asked Plaintiffs whether they intended to dismiss their doomed ATDS claim.  Plaintiffs declined to do so, and so Sirius XM brings this Motion for Partial Summary Judgment to narrow the issues before the Court.

## **LEGAL STANDARD**

In deciding a motion for judgment on the pleadings under Rule 12(c), the court "employ[s] the same standard applicable to dismissals" for failure to state a claim under Rule 12(b)(6).

*Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  "To survive a Rule 12(c) motion," the complaint must therefore "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.*  "[F]actual content that is 'merely consistent with,' rather than suggestive of, a finding of liability [cannot] support a reasonable inference" that pushes the plaintiff's claim across the line of plausibility.  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  That is, the allegations must have "enough heft" to show that the plaintiff is "entitled to relief."  *Twombly*, 550 U.S. at 557.

In assessing a complaint's sufficiency, the court need not "accept as true a legal conclusion couched as a factual allegation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2019), nor need it "accept as true allegations that are wholly conclusory," *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 89 (2d Cir. 2019).  The court may also "draw on its judicial experience and common sense" in determining whether "the well-pleaded facts … permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I.   PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THE PRESENCE OF A RANDOM OR SEQUENTIAL NUMBER GENERATOR.

To qualify as an ATDS, equipment "must have the capacity to generate random or sequential numbers."  *Facebook*, 141 S. Ct. at 1168.  Nothing in Plaintiffs' Complaint plausibly supports a conclusion that Sirius XM's vendors' equipment has that unusual capacity, so their ATDS claim fails.

#### A.   *Facebook* Requires the Presence of a Random or Sequential Number Generator.

Confusion had long surrounded the ATDS provision: does it cover everything that automatically dials from a list, or only those pieces of equipment that can generate random or

sequential numbers?  *Facebook* resolved that dispute.  From first to last, its opinion demonstrates that an autodialer "must have the capacity to generate random or sequential numbers."  *Id.*

Consider first the Supreme Court's textual analysis.  The Court framed the inquiry before it as whether the modifying phrase "using a random or sequential number generator" restricts both verbs (in which case all autodialers must either "store" or "produce" numbers using such a generator) or instead restricts only the verb "produce" (in which case equipment that merely "stores" numbers could qualify).  *See id.* at 1169.  After examining the rules of grammar and the canons of construction, the Supreme Court held that the modifier governs both: "[I]n all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator."  *Id.* at 1170.  The "statutory context" proved the same point.  Congress carefully chose the lines covered by the ATDS provision—emergency lines, multi-line businesses, and then-pricey wireless lines, but not residential lines.  *See id.* at 1171.  "These prohibitions target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity."  *Id.*

The Supreme Court's discussion of the TCPA's legislative history further demonstrates the centrality of random or sequential number generators to the ATDS provision.  The Supreme Court explained that Congress enacted the ATDS provision, not as a general "privacy-protection" measure, but to prevent the "unique problems for business, emergency, and cellular lines" caused by "the use of random or sequential number generator technology."  *Id.* at 1172.  Given that background, it was "[u]nsurprising[]" that the "narrow" "autodialer definition Congress employed includes only devices that use such technology."  *Id.*

Finally, the Supreme Court's discussion of the practical consequences of its decision—and the consequences of a counterfactual decision in the plaintiff's favor—emphasizes again the

statute's random-or-sequential-number-generator requirement.   The Court explained that "[e]xpanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw" to the "nuanced problems" that Congress sought to solve through the ATDS provision. *Id.* at 1171.  Indeed, reading the statute as the plaintiffs' bar requested "could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses." *Id.*  By contrast, the Supreme Court acknowledged that its interpretation of the statute gave it a narrow reach.  But "'[s]enescent' as a number generator (and perhaps the TCPA itself) may be, that is no justification for eschewing the best reading of § 227(a)(1)(A)." *Id.* at 1173.  "This Court must interpret what Congress wrote, which is that 'using a random or sequential number generator' modifies both 'store' and 'produce.'" *Id.*  Facebook's equipment—which stored numbers and automatically texted them when someone new tried to access the associated Facebook account, *see id.* at 1168—could not do so, and so it was "not an autodialer." *Id.* at 1169.

### B.   Plaintiffs Have Not Plausibly Alleged the Presence of Random or Sequential Number Generator.

To survive under *Facebook*'s interpretation of the ATDS provision, Plaintiffs must therefore plausibly allege that Sirius XM's vendors' equipment "use[s] a random or sequential number generator." *Id.* at 1170.  As a matter of common sense—which, again, courts may consider on a motion for judgment on the pleadings, *see, e.g.,* *New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 673 (S.D.N.Y. 2015)—that is a highly unlikely proposition.  As explained above, Sirius XM's satellite service works only on Sirius XM-compatible radios.   In keeping with this incontrovertible fact, Sirius XM works with OEMs to install compatible radios in many (but not all) automobiles and to include trial subscriptions with the purchase of those vehicles.  It would make no sense for Sirius XM to call randomly or sequentially generated numbers in the hopes that

the recipient would happen to have a Sirius XM-compatible radio, let alone that the recipient would have already received a trial subscription.  By contrast, targeted calling to those who have received one for their Sirius XM-equipped cars—that is, dialing from a list—makes perfect sense, and there can be no plausible allegation to the contrary.  In short, given these circumstances, it would take a lot to suggest that Sirius XM's vendors nonetheless deploy equipment that "use[s] a random or sequential number generator."  *Facebook*, 141 S. Ct. at 1170; *see also, e.g.*, *Mosley v. Gen. Revenue Corp.*, No. 1:20-cv-01012-JES-JEH, 2020 WL 4060767, at *4 (C.D. Ill. July 20, 2020) (dismissing the ATDS claim because it is "not plausible to conclude that a company seeking to collect debts … would use a system that randomly and sequentially generates phone numbers").

Plaintiffs' sparse allegations do not push their strange claim into plausibility.  Start with Plaintiffs' boilerplate claim that Sirius XM's vendors' equipment "ha[d] the capacity to store or produce telephone numbers to be called using a random or sequential number generator."  Compl. ¶ 51.  "Threadbare recitals of the elements of the cause of action … do not suffice."  *Iqbal*, 556 U.S. at 678.  TCPA claims are no exception.  A "bare allegation that defendants used an ATDS is not enough" to survive a motion to dismiss.  *Shcherb v. Angi Homeservices Inc.*, No. 19-CV-367 (JPO), 2019 WL 5530803, at *1 (S.D.N.Y. Oct. 25, 2019); *see also, e.g.*, *Herrera v. Navient Corps.*, No. 19-CV-06583 (AMD) (VMS), 2020 WL 3960507, at *6 (E.D.N.Y. July 13, 2020) (same).  Instead, the plaintiff must "allege facts that would allow for a reasonable inference that an ATDS was used."  *Krady v. Eleven Salon Spa*, No. 16 CV 5999 (MKB)(RML), 2017 WL 6541443, at *4 (E.D.N.Y. July 28, 2017).

Plaintiffs have not provided additional facts that suggest that Sirius XM's vendors use equipment that generates random or sequential numbers.  They do not allege, for example, that Sirius XM expressly attempted to secure consent to contact them through what it itself labeled

"autodialed messages," an attempt that would suggest Sirius XM or its vendors used equipment that fell within the statutory definition. *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 476 (S.D.N.Y. 2018). Plaintiffs have also not alleged that Sirius XM's agents delivered "generic" messages through an "automated" platform that delivered "billion[s]" of communications, which might suggest that Sirius XM's vendors engaged in the non-directed, random-or-sequential telemarketing techniques historically performed by autodialers. *Id.* at 476–77; *see also, e.g.*, *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 140 (E.D.N.Y. 2015) (allowing claim to proceed where plaintiff alleged "mass," "[im]personaliz[ed]" text messages); *Schleifer v. Lexus of Manhattan*, No. 17-cv-8789 (AJN), 2019 WL 4640055, at *6 (S.D.N.Y. Sept. 24, 2019) ("seemingly automated" text messages); *Simon v. Ultimate Fitness Grp., LLC*, No. 19 Civ. 890 (CM), 2019 WL 4382204, at *7 (S.D.N.Y. Aug. 19, 2019) ("impersonal, generic messages"); *Metten v. Town Sports Int'l, LLC*, 18-CV-4226 (ALC), 2019 WL 1299939, at *3 (S.D.N.Y. Mar. 21, 2019) ("generic," "*en masse*" text messages). Finally, Plaintiffs do not allege anything about themselves or about Sirius XM to suggest that Sirius XM somehow stumbled upon their numbers by happenstance (and such an allegation would make no sense). They do not, for instance, allege that they never purchased a vehicle that included Sirius XM services. *See Metten*, 2019 WL 1299939, at *1; *see also, e.g.*, *Despot v. Allied Interstate, Inc.*, No. 15-15, 2016 WL 4593756, at *5 (W.D. Pa. Sept. 2, 2016) (dismissing where "the calls were not random or sequential because they were made to Plaintiff"); *Trumper v. GE Capital Retail Bank*, 79 F. Supp. 3d 511, 513 (D.N.J. 2014) (dismissing because the allegations made clear the calls were specifically targeted).

Offering no credible allegations, Sawyer is left with the assertion that, when she answered the call on December 11, 2020, she "heard a click" and "needed to say 'Hello' multiple times

before a person answered her."  Compl. ¶ 27.  (Roberts recounts an identical experience.  Compl. ¶ 36.)  Those clicks and pauses may be enough to allege (albeit falsely) that Sirius XM's vendors used *predictive* dialers—or, in the Complaint's terms, that their equipment could "receive and store lists of phone numbers, and … dial such numbers, *en masse*, simultaneously and without human intervention."  Compl. ¶ 51.  Clicks occur in predictive dialers when the equipment transfers the call from the automated dialing function to the call center agents waiting to take answered calls.  Pauses happen because of a mismatch between the number of calls actually answered and the agents available to take them; if the algorithm underestimates the number of agents needed (or overestimates the number of agents who will be available), "predictive dialers may either 'hang-up' on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in … 'dead air.'"  2003 TCPA Order, 18 FCC Rcd. at 14101–02.  Back when courts often read the ATDS provision to cover predictive and other computer-assisted dialers (or felt bound by the FCC's statements to that effect), allegations about clicks and pauses were sometimes enough to state a claim.  *See, e.g.*, *Scalercio-Isenberg v. Citizens Fin. Grp., Inc*, No. 18-cv-9226 (JGK), 2019 WL 7187247, at *6 (S.D.N.Y. Dec. 26, 2019) (focusing on "robo calls" where "no person was on the line when [the plaintiff] answered"); *Lundstedt v. Deutsche Bank Nat'l Trust Co.*, No. 3:13-cv-01423 (JAM), 2016 WL 3101999, at *5 (D. Conn. June 2, 2016) (allowing pro se allegation that he was left "waiting and waiting and waiting" before an agent picked up to proceed).  *But see, e.g.*, *Norman v. AllianceOne Receivables Mgmt., Inc.*, 637 F. App'x 214, 216 (7th Cir. 2015) (clicks and pauses do not create a genuine issue of material fact because "[c]alls are dropped or paused for many reasons," not just because of automated dialing); *Aaronson v. CHW Grp., Inc.*, No. 1:18-cv-1533, 2019 WL 8953349, at *4 (E.D. Va. Apr. 15, 2019) (noting that "courts have

routinely held that a plaintiff cannot support a belief that an ATDS was being used by alleging only that plaintiff experienced 'dead air' during the calls at issue" and collecting cases).

Under *Facebook*, however, alleging the use of a predictive dialer is no longer enough.  As explained above and as the FCC has acknowledged, predictive dialing involves a "*timing function,*" not "number storage or generation."   2003 TCPA Order, 18 FCC Rcd. at 14091 (emphasis added).  As a result, whether a caller used a predictive dialer sheds no light on whether it deployed equipment that "use[s] a random or sequential number generator," and the clicks and pauses that Sawyer and Roberts allegedly heard are beside the point.  *Facebook*, 141 S. Ct. at 1170; *see, e.g.*, *Perez v. Quicken Loans, Inc.*, No. 19-cv-2072, 2020 WL 1491145, at *2–*3 (N.D. Ill. Mar. 27, 2020) (allegations about predictive dialers "are too thin to support an inference that [a caller] used an ATDS"); *Bader v. Navient Solutions, LLC*, No. 18-cv-1367, 2019 WL 2491537, at *2 (N.D. Ill. June 14, 2019) (alleging the use of a "predictive dialer" does not plausibly allege the use of equipment "that ha[s] the capacity to generate random or sequential numbers").  Indeed, those allegations cut *against* Sawyer's and Roberts's ATDS claims.  They suggest that, far from dusting off archaic equipment used to indiscriminately blast calls to random recipients, Sirius XM's vendors—like virtually everyone else in the industry—use equipment that "us[es] lists of numbers."  2003 TCPA Order, 18 FCC Rcd. at 14092.  So too for Sawyer's allegation that she received multiple calls.  *See* Compl. ¶¶ 21–27.  It would be bad enough luck to get *one* call from a random or sequential number generator.  But several?  That is hardly "plausible."  *Hayden*, 594 F.3d at 160.

### C.      Plaintiffs' Likely Counterarguments Fail.

TCPA plaintiffs have tried to stave off defeat after *Facebook* in two main ways—by focusing on the term "capacity" in the ATDS provision and by highlighting dicta in a footnote in the Supreme Court's decision.  But those efforts both come up short.

1.     **"Capacity" cannot save Plaintiffs' claims.**

The ATDS provision covers equipment that has the "*capacity*" to perform the requisite ATDS functions.  47 U.S.C. § 227(a)(1) (emphasis added).  In light of this term, courts have held that "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009).  And plaintiffs have argued that "capacity" covers not just what the equipment could do in its current condition, but what it might be reprogrammed or reconfigured to do.  *See* 2015 TCPA Order, 30 FCC Rcd. at 7975 (interpreting "capacity" to include "potential functionalities" that would arise upon "the addition of software to actually perform" the requisite functions), *vacated*, *ACA Int'l*, 885 F.3d at 696–97.  Plaintiffs might try to save their Complaint by arguing that Sirius XM's vendors' equipment has the "capacity" to generate random or sequential numbers because it could be modified to do so.

Any attempt to do so would falter in light of *King v. Time Warner Cable Inc.*, 894 F.3d 473 (2d Cir. 2018).  There, the district court held that the word "capacity" "extended the TCPA to reach any device that could be modified by software changes to perform the functions of an autodialer."  *Id.* at 476–77.  The Second Circuit disagreed.  It held that, to qualify as an ATDS, a device must "*currently* ha[ve] features that enable it to perform the functions of an autodialer— whether or not those features are actually in use during the offending call."  *Id.* at 479 (emphasis added).  Under that definition, what matters is whether the device—"absent any modifications to [its] hardware or software"—can perform the "functions" that an ATDS must perform.  *Id.* at 481.

*King* prevents Plaintiffs from relying on "capacity" to save their Complaint.  To satisfy *King* (and *Facebook*), they must allege that, as "currently" configured, Sirius XM's vendors' equipment can "use a random or sequential number generator."  *King*, 894 F.3d at 479; *Facebook*, 141 S. Ct. at 1170.  But for all the reasons given above, they have failed to do so.  As a result, even

if Sirius XM's vendors' equipment might be "modif[ied]" to generate random or sequential numbers, *King*, 894 F.3d at 481, Plaintiffs have not stated an ATDS claim.

### 2.    Footnote 7 cannot save Plaintiffs' claims.

Plaintiffs might also try to harness dicta in a footnote in *Facebook* to save their ATDS claims. The plaintiff there argued that the modifying phrase cannot restrict the verb "store," because it is impossible to "store" a number "using a random or sequential number generator." *See* 141 S. Ct. at 1171–72. The Court disagreed. As a "matter of ordinary parlance, it is odd to say that a piece of equipment 'stores' numbers using a random number 'generator.'" *Id.* But "as a technical matter," the Patent Office had "issued patents for devices that used a random number generator to store numbers to be called later (as opposed to using a number generator for immediate dialing)." *Id.* at 1172. In a footnote, the Court added:

> Duguid argues that such a device would necessarily "produce" numbers using the same generator technology, meaning "store or" in § 227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544, n. 7, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute.

*Id.* at 1172 n.7. Plaintiffs might try to rely on this footnote to claim that Sirius XM's vendors' equipment uses a random or sequential number generator because it selects (randomly or sequentially) the order in which calls are placed to those on Sirius XM's preproduced lists.

This argument also fails. As an initial matter, Plaintiffs have not pleaded that Sirius XM's vendors' equipment operates in anything like the fashion just described. They have not claimed that it randomly selects numbers from a preprogrammed list. Nor have they asserted that it sequentially pulls numbers from such lists—either in the true meaning of "sequential" under the

TCPA (996-1234, 996-1235, and so on) or the more generic meaning of the word (any particular ordering).  So even if *Facebook*'s dicta means what Plaintiffs' claim, it would not help them here.

Moreover—and more importantly—Plaintiffs' argument about footnote 7 proves too much.  It cannot be squared with the logical point (which Plaintiffs cannot fairly controvert) that Sirius XM is dialing from lists of trial subscribers.  And, over and again, the Supreme Court reiterated that, under its interpretation, the ATDS provision does not cover equipment that merely dials from a list.  For example, it framed the question before the Court as whether the ATDS prohibition "encompasses equipment that can 'store' and dial telephone numbers, even if the device does not 'us[e] a random or sequential number generator." 141 S. Ct. at 1167.  Answer? "It does not."  *Id.*  Along similar lines, the Court contrasted its "narrow" interpretation—tied to the "unique problems" caused by "the use of random or sequential number generator technology"—with the plaintiff's store-and-dial-numbers approach, which would "capture virtually all modern cell phones."  *Id.* at 1171, 1172.

If footnote 7 means what Plaintiffs claim, then all of these limits are illusory.  As the D.C. Circuit has explained, "[a]nytime phone numbers are dialed from a set list, the database of numbers must be called in *some* order—either in a random or in some other sequence."  *ACA Int'l*, 885 F.3d at 702 (emphasis in original).  But if selecting that sequence qualifies as "using a random or sequential number generator," then there is "no difference between 'dialing random or sequential numbers' and 'dialing a set list of numbers,'" *id.* at 701–02, and everything becomes an ATDS once again.  This Court should not read a stray remark in a footnote of dicta to overrule the Court's key holding.

## **CONCLUSION**

For the foregoing reasons, this Court should grant judgment on the pleadings for Sirius XM with respect to Plaintiffs' ATDS claim.

Dated:  June 4, 2021    Respectfully submitted,

            */s/ Lee A. Armstrong*

            Lee A. Armstrong
            Allison L. Waks
            JONES DAY
            250 Vesey Street
            New York, New York
            Tel: (212) 326-3939
            Fax: (212) 755-7306
            Email: laarmstrong@jonesday.com
            Email: awaks@jonesday.com

            Thomas Demitrack (admitted *pro hac vice*)
            JONES DAY
            North Point
            901 Lakeside Avenue
            Cleveland, OH 44114-1190
            Tel: (216) 586-3939
            Fax: (216) 579-0212
            Email: tdemitrack@jonesday.com

            *Attorneys for Defendant Sirius XM Radio Inc.*

## CERTIFICATE OF SERVICE

I, Lee A. Armstrong, hereby certify under penalty of perjury that on June 4, 2021, I caused a true and correct copy of the foregoing to be filed with the Court and served on counsel of record by ECF.

Dated: New York, New York          _/s/ Lee A. Armstrong_____
       June 4, 2021                          Lee A. Armstrong